UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Eric Williams, | |
| Petitioner, | MEMORANDUM DECISION |
| v. | No. 22-cv-03226-NRM |
| Thomas McGuinness, | |
| Respondent. | |

NINA R. MORRISON, United States District Judge:

Now pending before this Court is Eric Williams's petition for a writ of habeas corpus, in which he challenges his 2015 convictions for second-degree murder and related offenses. The crimes for which Williams was convicted arise from a series of events occurring in the early morning hours of May 15, 2001, in which Williams sought to collect on a $200 drug debt owed to him. These events culminated in a high-speed car chase in which Williams was the driver of one of the vehicles, and the other was occupied by three high-school seniors. A shot was fired from Williams's car, and one of the occupants of the fleeing car was killed in the resulting vehicular crash. The other two were seriously injured.

Williams has been tried twice for crimes arising out of this incident; this Petition arises from convictions following Williams's second jury trial. Williams's first trial took place in 2003. In that proceeding, Williams was convicted in the Supreme Court of the State of New York, Suffolk County, (Mullen, J.), of Murder in the Second Degree (under a depraved indifference to human life theory), two counts

1

of Assault in the First Degree, one count of Criminal Use of a Firearm in the First Degree, and one count of Criminal Possession of a Weapon in the First Degree. Williams was sentenced to an aggregate sentence of 30 years to life imprisonment. His convictions were affirmed on direct appeal, and he was unsuccessful in collaterally attacking his convictions in state court.  However, Williams was successful in federal court.  In 2013, the Hon. John Gleeson granted Williams's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, concluding that the trial was "afflicted by serious error," since the prosecution had deliberately elicited inadmissible testimony accusing Williams of committing a prior, uncharged murder that was highly prejudicial to Williams.

The District Attorney of Suffolk County did not appeal Judge Gleeson's decision to grant habeas relief.  Williams was retried in Suffolk County Supreme Court before a different judge (Ambro, J.) in 2015.  He was again convicted of the same crimes, and again sentenced to an aggregate term of 30 years to life imprisonment.  His convictions were affirmed, and he was again unsuccessful in collaterally attacking his conviction in state court.

Williams, proceeding *pro se*, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("the Petition").  *See* ECF No. 1.  Williams argues that, at the 2015 trial, (1) his rights under the Confrontation Clause were violated, (2) the prosecution knowingly introducing false testimony, (3) the prosecution failed to disclose exculpatory evidence, (4) trial counsel rendered

ineffective assistance, and (5) the cumulative effect of all errors denied him his rights to a fair trial and due process. *See* ECF No. 1 at 5–15.

After careful consideration of the underlying record and each of the claims presented by Williams, for the reasons that follow, the Petition is DENIED.

## BACKGROUND

In the early hours of May 15, 2001, Williams drove his car in a high-speed car chase, pursuing another car occupied by three teenage girls: Candice Arena, Melissa Weiner, and the driver, Melissa Singh. ECF No. 15-7 at 342, 344 (Weiner Test.), 430–33 (Singh Test.).[1]  A shot fired from Williams's vehicle caused Singh's car to collide with a train trestle and fly into the air.  Arena was ejected from the car midair and fell onto the pavement; Singh and Weiner were trapped in the upside-down car.  Weiner and Singh were seriously injured.  One day after the crash, Arena died from her injuries.

The car chase stemmed from a dispute over a drug debt of about $200 that Weiner allegedly owed Williams.  The two had become acquainted a few months earlier, in early 2001.  Weiner—then a high school senior—had been having difficulties at home, and her parents ultimately told her to leave their house. ECF No. 15-7 at 324 (Weiner Test.).  She stayed with various friends during this period, including Jose Morales, with whom she had a brief intimate relationship. ECF No. 15-7 at 325 (Weiner Test.); ECF No. 15-11 at 258 (Morales Test.).  Morales

---

[1] The state court record in this case is voluminous and is not always consecutively paginated.  Pincites refer to page numbers generated by CM/ECF, and not the document's internal pagination.

introduced her to his friend, Williams, who also let Weiner stay at his place during this time. ECF No. 15-7 at 325–26 (Weiner Test.); ECF No. 15-11 at 258 (Morales Test.). Williams, a small-time drug dealer, fronted cocaine to Weiner to sell at school, with the promise that she would reimburse him—and the incentive that she would be able to keep any extra proceeds for herself. ECF No. 15-7 at 327–29 (Weiner Test.). The second time he did so, Weiner used the drugs herself and with her friends, and was unable to repay Williams. ECF No. 15-7 at 330–31 (Weiner Test.). She owed him a debt of approximately $200. ECF No. 15-7 at 331 (Weiner Test.); ECF No. 15-11 at 7 (Madigan Test.), 259–60 (Morales Test.). Weiner began avoiding Williams. ECF No. 15-7 at 331–33 (Weiner Test.). Williams made several efforts to collect on this debt, including calling Morales, calling Weiner's house, showing up at Weiner's bus stop and going to her house and speaking to Weiner's mother. ECF No. 15-7 at 332 (Weiner Test.); ECF No. 15-11 at 8, 45 (Madigan Test.), 260:12–15 (Morales Test.).

On the night of May 14, 2001, Weiner, Arena, and Singh were out at a friend's house. ECF No. 15-7 at 334 (Weiner Test.), 425–26 (Singh Test.). At this time, Weiner was having problems with Gina Hendrickson, Morales's on-again, off-again girlfriend who had learned of Weiner's brief relationship with Morales. ECF No. 15-7 at 336–37 (Weiner Test.), 426 (Singh Test.); ECF No. 15-11 at 261–62 (Morales Test.). Weiner, Singh, and Arena (along with their friend Dennis), decided to go meet up with Hendrickson to settle things. ECF No. 15-7 at 337 (Weiner Test.), 426 (Singh Test.). They all got into Singh's red Nissan Maxima and drove to

4

Case 2:22-cv-03226-NRM   Document 17   Filed 09/27/23   Page 5 of 68 PageID #: 5636

meet Hendrickson.  ECF No. 15-7 at 423, 426–27 (Singh Test.).  They met Hendrickson and others, including Morales, at a parking lot on Deer Park Avenue. ECF No. 15-7 at 338 (Weiner Test.).  Weiner and Hendrickson exchanged words, and then Arena and Hendrickson began physically fighting.  ECF No. 15-7 at 338–39 (Weiner Test.), 427–28 (Singh Test.); ECF No. 15-11 at 262–63 (Morales Test.). Morales and others tried to break up the fight.  ECF No. 15-7 at 428 (Singh Test.); ECF No. 15-11 at 263 (Morales Test.).  As things were escalating, Weiner heard Morales on the phone saying, "Melissa's here, you can come get your money."  ECF No. 15-7 at 339–40 (Weiner Test.).  Weiner assumed that Morales was talking to Williams and urged her friends to leave at once.  ECF No. 15-7 at 340 (Weiner Test.).  Although none of her friends knew about her drug debt with Williams, ECF No. 15-7 at 333 (Weiner Test.), *see* ECF No. 15-7 at 341–42 (Weiner Test.), 429–30 (Singh Test.), they left the parking lot.  ECF No. 15-7 at 341 (Weiner Test.), 429 (Singh Test.).  After hiding out at a high school parking lot for a little while, they went to a 7-Eleven on Deer Park Avenue.  ECF No. 15-7 at 341–43 (Weiner Test.), 430–31 (Singh Test.).

Williams got the call from Morales alerting him to Weiner's whereabouts when he was at home with his girlfriend, Rebecca Madigan, watching a movie.  ECF No. 15-11 at 10–11 (Madigan Test.).  He gathered his things and got in his car, a green Jetta, *see* ECF No. 15-11 at 12 (Madigan Test.), 266 (Morales Test.), with Madigan who rode in the passenger seat.  ECF No. 15-11 at 12–13 (Madigan Test.). After the girls left, Morales called Williams back to let him know that Weiner had

gone.  ECF No. 15-11 at 265–66 (Morales Test.).  Williams told Morales he was in the area and would cruise around a little.  ECF No. 15-11 at 265–66 (Morales Test.); *see* ECF No. 15-11 at 14 (Madigan Test.).  Williams continued to drive around looking for Weiner.  ECF No. 15-11 at 10–12 (Madigan Test.); 264–67 (Morales Test.).

Williams and Madigan came upon Weiner and her friends at the 7-Eleven on Deer Park Avenue.  ECF No. 15-7 at 343–44 (Weiner Test.); ECF No. 15-11 at 15 (Madigan Test.).  Williams got out of the car to confront Weiner, and Weiner urged Singh to drive away.  ECF No. 15-7 at 343–45 (Weiner Test.); ECF No. 15-11 at 15– 16 (Madigan Test.); *see* ECF No. 15-7 at 287–88 (Mulligan Test.).  Singh quickly "peeled out of the parking lot" and onto the street—with Williams close behind. ECF No. 15-7 at 346 (Weiner Test.); *see* ECF No. 15-7 at 289 (Mulligan Test.).  A car chase ensued, reaching speeds of approximately 80-90 miles per hour.  ECF No. 15- 11 at 17, 20 (Madigan Test.); *see* ECF No. 15-7 at 290 (Mulligan Test.).  During the chase, Williams called Morales back, telling Morales he saw the girls at 7-Eleven, they got spooked, and that he was pursuing a car on Deer Parke Avenue.  ECF No. 15-11 at 267 (Morales Test.).  Morales remained on the line with Williams, although the call disconnected at one point and then reconnected.  *See* ECF No. 15-11 at 267, 269 (Morales Test.).

Throughout the chase, Madigan remained in the passenger seat of Williams's car.  ECF No. 15-11 at 13, 81 (Madigan Test.).  During the chase, a shot was fired from Williams's car towards Singh's car.  ECF No. 15-11 at 21–22 (Madigan Test.);

*see also* ECF No. 15-11 at 392–94 (Krivosta Test.) (testifying that he observed damage consistent with the impact of a bullet in examining Singh's Nissan).

At each of Williams's two trials, Madigan testified that Williams fired the shot while he was driving.  ECF No. 15-11 at 21 (Madigan Test.); *see also Williams v. Artus*, No. 11-cv-5541 JG, 2013 WL 4761120, at *4–5 (E.D.N.Y. 2013).  At the time, Williams's car was in the right lane, and Singh's car was in the left.  ECF No. 15-11 at 21 (Madigan Test.).  Williams's car was close enough that his front bumper was level with Singh's rear bumper.  ECF No. 15-11 at 21 (Madigan Test.); *see also* ECF No. 15-7 at 440:4–10 (Singh Test.) ("I remember being in the left lane, I remember seeing the rearview mirror headlights and the car being like in the right lane but behind . . . Like not parallel to me, like behind me, but in the opposite lane of mine.").  After the shot was fired, Singh lost control of her car, which crashed into a train trestle and flipped into the air.  ECF No. 15-11 at 22 (Madigan Test.); *see* ECF No. 15-11 at 272 (Morales test.) (testifying that Williams told him "the car went into the center divider of [route] 231, bounced off of that, went up the embankment.  When it went up the embankment, it flipped over upside down . . . ."); *see* ECF No. 15-11 at 172–73 (Vanderlinde Test.).  Arena was ejected from the car and killed.  ECF No. 15-10 at 84 (Treanor Test.); *see* ECF No. 15-11 at 273:10–16 (Morales Test.) (testifying that Williams told him that "one of the girls was ejected from the car.").  Singh and Weiner were both seriously injured.  ECF No. 15-7 at 348 (Weiner Test.), 441–42 (Singh Test.).

By the time of his second phone call with Williams, Morales had started driving towards Deer Park Ave.  ECF No. 15-11 at 269–70 (Morales Test.).  After the crash, Morales drove by the scene and called 911, although he gave a different name and cell phone number.  ECF No. 15-11 at 269–70 (Morales Test.).  Morales then went to Williams's house and spoke to Williams and Madigan in the driveway about what had happened.  ECF No. 15-11 at 271 (Morales Test.).  Morales then went back to his house, and Williams and Madigan came over.  ECF No. 15-11 at 272 (Morales Test.).  Williams stashed another one of his guns at Morales's house.  ECF No. 15-11 at 272 (Morales Test.).  Around this time, Morales drove back by the scene of the crash and saw a tarp over a body.  ECF No. 15-11 at 274–75 (Morales Test.).  He returned home and advised Williams that someone had died.  ECF No. 15-11 at 275:17–18 (Morales Test.).

The next morning, Williams, Madigan, and another friend went upstate. ECF No. 15-11 at 29 (Madigan Test.); *see* ECF No. 15-11 at 276–77 (Morales Test.). They stayed upstate for three days, and when they returned, Williams learned that Weiner had survived the crash.  ECF No. 15-11 at 30–31 (Madigan Test.); *see* ECF No. 15-11 at 277 (Morales Test.).

### I. The 2003 Trial and Post-Conviction Review

Williams was tried in 2003 and was found guilty by a jury of second degree murder, N.Y.P.L. § 125.25(2) (reckless homicide "[u]nder circumstances evincing a depraved indifference to human life"), two counts of first degree assault, N.Y.P.L. § 120.10(3) ("[u]nder circumstances evincing a depraved indifference to human life"),

8

one count of first degree criminal use of a firearm, N.Y.P.L. § 265.09(1)(a), and criminal possession of a weapon in the second degree, N.Y.P.L. § 265.03(1)(b).  ECF No. 11 at 2–3.  Williams was sentenced to an aggregate indeterminate term of 30 years to life imprisonment.  *See* ECF No. 15-25 at 6; ECF No. 11 at 2–3.

Williams was unsuccessful in attacking his convictions on direct appeal and in state post-conviction proceedings.  In November 2011, Williams filed a petition for a writ of habeas corpus in the Eastern District of New York.  Judge Gleeson granted Williams's petition on two grounds.  First, he found that the prosecutor committed misconduct by deliberately eliciting inadmissible evidence of a prior uncharged murder, and that the trial judge gave an inadequate curative instruction, which together deprived Williams of his right to a fair trial.  *Williams v. Artus*, 2013 WL 4761120, at *13 ("[T]he prosecutor asked Madigan on direct examination, '[D]id [Williams] ever tell you about any other experience he may have had with firearms?" [and] Madigan responded that, "A few occasions he said that this isn't the first time that he's killed somebody.  That he's done it before.").  Further, even after defense counsel objected and the court issued a curative instruction, the prosecutor proceeded to reference Madigan's testimony about a prior murder—and exaggerated it—in her summation.  *Id.* at *14–16.

As a second ground for granting the petition, Judge Gleeson found that Williams was deprived of effective assistance of appellate counsel, who should have argued that trial counsel's failure to object to the prosecutor's use of the stricken testimony during summation constituted ineffective assistance of counsel.  *Id.* at

*21–22.  Based on these two constitutional defects, Judge Gleeson granted the petition for a writ of habeas corpus.  The Suffolk County District Attorney's Office did not appeal or seek reconsideration but chose to retry Williams on the original indictment.  ECF No. 11 at 3.

## II. The 2015 Trial

### a. Pretrial Proceedings

The court held a pre-trial hearing concerning the admissibility of prior testimony by a prosecution witness from the 2003 trial, Jose Vanderlinde. Vanderlinde had been a cellmate of Williams's at the Metropolitan Detention Center ("MDC"), Brooklyn, in 2002 while Vanderlinde was awaiting sentencing on federal drug conspiracy charges.  ECF No. 15-11 at 163–64, 169–70.  Vanderlinde, a jailhouse informant, claimed in his 2003 testimony that Williams had told him about the May 2001 car crash and the events surrounding it.  However, Vanderlinde was a citizen of the Dominican Republic, and had been deported in 2013.  The prosecution sought to read the transcript of his testimony from the 2003 trial into the record at the 2015 trial, arguing that Vanderlinde was unavailable to testify, and Williams had had a full and fair opportunity to cross examine him at the 2003 trial.  ECF No. 15-3 at 2–3; N.Y. Crim. Proc. Law § 670.10.

To establish Vanderlinde's unavailability, the prosecution put on two witnesses: a deportation officer with Immigration Customs & Enforcement ("ICE"), Dennis Carroll, and an investigator from the Suffolk County police department, Richard Lane.  Deportation Officer Carroll confirmed that Vanderlinde had indeed been deported to the Dominican Republic in August 2013.  ECF No. 15-3 at 10, 13–

10

15.  He also confirmed that the basis for his deportation was his conviction for an aggravated felony, and accordingly he had a lifetime ban from admission to the United States.  ECF No. 15-3 at 13–14.

Detective-Investigator Lane had attempted to locate Vanderlinde in advance of the second trial.  He testified that he visited an address previously associated with Vanderlinde and waited outside until he met a man who identified himself as Vanderlinde's son.  ECF No. 15-4 at 8.  Vanderlinde's son relayed that he spoke with his father about twice a week, and his father was living near Santo Domingo.  ECF No. 15-4 at 8–9.  Lane testified that he obtained Vanderlinde's phone number from his son, and that he searched the number and ascertained that "the number comes back to the Dominican Republic."  ECF No. 15-4 at 9:17–18.  On cross examination, however, Lane conceded that "at no time" did he actually call this number or otherwise try to contact Vanderlinde.  ECF No. 15-4 at 15:8-13.

The prosecution argued that, because Vanderlinde had been deported and was statutorily inadmissible from the United States for life, due diligence did not require the prosecution to attempt to bring him back into the country.  ECF No. 15-4 at 28.  The trial court ruled that the prosecution had demonstrated that Vanderlinde was unavailable to testify and that a transcript of his testimony from the 2003 trial was to be read into the record at the 2015 trial.  ECF No. 15-4 at 34–37.

**b.  Trial**

11

Williams was retried on the original indictment in 2015.  Although the Defense called no witnesses, nor did Williams testify (as was, of course, his constitutional right), the defense challenged the prosecution's proof through cross examination of its witnesses and impeachment efforts as to several of the prosecution's key witnesses—particularly Madigan, Morales, and Weiner.  Through counsel, Williams did not dispute that he had in fact been driving the car in pursuit of the girls, but argued that it was Madigan who fired the shot at their car that led to the crash, not he.  *See, e.g.*, ECF No. 15-10 at 59; ECF 15-13 at 62–63, 72–73; *see* ECF No. 15-11 at 112–15.  The defense further argued that the prosecution had not established the elements of murder under a depraved indifference theory if Williams was only chasing the girls' car—concededly at high speeds—but not shooting at the car.  ECF No. 15-13 at 78–80.

The jury heard testimony about the events leading up to the incident, the crash itself, and the events following, as detailed *supra*, through the following witnesses.

The prosecution first called three law enforcement witnesses: public safety dispatcher Anthony Bocchimuzzo, Officer Ronald Treanor, and Sergeant Arthur Hughes.  Bocchimuzzo laid the foundation for the recordings of Morales's 911 phone calls, ECF No. 15-10 at 71–78, which were played for the jury.  ECF No. 15-10 at 77.  Officer Treanor was the first member of law enforcement who came upon the scene of the crash, and testified to the condition of the vehicles, the location of Arena's body in the road, and the location of the crash relative to the 7-Eleven.  ECF No. 15-

10 at 83–87, 96–98.  Sergeant Hughes, of the crime scene division of the Suffolk

County Sheriff's Police Department, ECF No. 15-10 at 118–19, described how he

processed the crime scene.  ECF No. 15-10 at 126–31.

The prosecution next called Robert Mulligan, a patron at the 7-Eleven who

had witnessed the initial confrontation in the parking lot, including Singh's Nissan

speeding out of the parking lot, with Williams's Jetta close behind.  ECF No. 15-7 at

286–89.  He had left the 7-Eleven but doubled back because he "just didn't feel

right," and witnessed the cars speeding down Deer Park Ave.  ECF No. 15-7 at 291–

92.  He did not witness the crash but arrived on the scene shortly after it occurred.

ECF No. 15-7 at 292–93.

The prosecution next called Melissa Weiner.  Weiner testified to the

background facts, detailed *supra*, of her relationship with Williams leading up to

the night of May 14–15, 2001.  Weiner explained that, several months after the

crash, she had left the hospital and was at home, still using a wheelchair.  ECF No.

15-7 at 350–51.  Williams came to see her at her house and asked her if she

remembered the accident.  ECF No. 15-7 at 351–52.  She told him she couldn't

remember anything.  ECF No. 15-7 at 352.  Williams didn't bring up the drug debt,

so Weiner brought it up and told him she would pay—he told her not to worry about

it.  ECF No. 15-7 at 352.  Weiner stated: "he said that I should have—I should count

myself lucky that the accident happened and that he would have killed me anyway."

ECF No. 15-7 at 352:23–25.  She also testified that Williams "said that he had

people wanting to take my place selling drugs for him, and that he told those people

13

if they wanted my place, they would have to find me and take care of me."  ECF No. 15-7 at 353:7–10.

The prosecution called Melissa Singh, who corroborated Weiner's account of the events leading up to the car chase.  ECF No. 15-7 at 422–28, 433–34.  She recalled, in the moments before the crash, being in the left lane and seeing rearview mirror headlights and a car just behind her, but in the right lane.  ECF No. 15-7 at 440, 473.

The prosecution next called Rebecca Madigan, who testified as to her relationship with Williams and the events surrounding the car crash.  She characterized Williams as "pissed off" that Weiner owed him about $200, saying "that he didn't want someone owing him money."  ECF No. 15-11 at 7:22–23.  She explained that Williams kept two small handguns in his apartment, a silver and a black one.  The black one he kept under his pillow and the silver one in a locked box.  ECF No. 15-11 at 9.

Describing the incident itself, Madigan recalled that, once he began chasing the Nissan, Williams's driving was "crazy," and he was "doing 80, 90 miles per hour, running through red lights."  ECF No. 15-11 at 17:15–16.  She had looked at the speedometer when they were running through red lights on Deer Park Avenue.  ECF No. 15-11 at 20.  Madigan explained that Williams was on the phone with Morales, ECF No. 15-11 at 18, and passed her the phone at some point.  ECF No. 15-11 at 87.  He pulled out his gun, and she yelled at him not to shoot.  ECF No. 15-11 at 18.  When the Nissan was in the left lane, Williams's Jetta was in the right

lane, and the Jetta "was basically inches away with [its] nose to the rear of their car. . . he pulled out the gun, stuck his hand out the window and shot at the car." ECF No. 15-11 at 21:18–25.  As the girls' car crashed, Madigan told Williams to stop, but he continued to drive, not stopping until he parked at a grocery store to stash his gun in the woods.  ECF No. 15-11 at 22, 24–25.

Madigan testified that, on the day after the crash, when she, Williams, and his friend Danny Gurcio were driving upstate, they believed that all the occupants of the Nissan had died.  ECF No. 15-11 at 29.  On the way, Williams was "bragging about getting away with murder," describing the crash as "raining sparkly bitches," and saying he "can't have people walking around owing him money."  ECF No. 15-11 at 29:17–19.  Madigan also recalled that Williams said that "they were going to kill [Madigan] and bury [her] in the woods" because she "was a witness and saw everything."  ECF No. 15-11 at 29:20–30:3.

After they returned to Long Island, Madigan and Williams learned that Weiner had survived the crash.  According to Madigan, Williams was "pissed off that she lived and that she could identify him and that he would be responsible for what happened."  ECF No. 15-11 at 32:6–8.  Madigan explained that Williams had wanted Weiner killed so she couldn't testify against him.  ECF No. 15-11 at 32.  Madigan testified that Williams "wanted me to kill [Weiner] so he wouldn't be found guilty of anything . . . he wanted me to go to his parents' house, get his mother's x-ray tech uniform, dress up as a nurse, go to the hospital and inject her with bleach

or something and kill her so she couldn't testify against him." ECF No. 15-11 at
32:20–33:8.

The prosecution's next witness was Vanderlinde, whose testimony was
presented through a read-back of his 2003 trial testimony.  Before the read-back
began, the defense challenged the introduction of Vanderlinde's prior testimony on
new grounds: that its prejudicial effect outweighed its probative value, that it was
tainted by a *Brady* violation, and that trial counsel at the 2003 trial was ineffective.
ECF No. 15-11 at 140, 144.  In support of these arguments, the defense introduced
minutes from Vanderlinde's sentencing in a federal drug case in the Southern
District of New York from July 25, 2002.  ECF No. 15-11 at 137–39; *see* ECF No. 15-
19 at 63.  This federal sentencing proceeding took place shortly after Vanderlinde
began cooperating with Suffolk County law enforcement against Williams (indeed,
his first meeting with law enforcement had only been the previous day, ECF No. 15-
19 at 68) and about seven months before he gave testimony at the 2003 trial.  The
sentencing minutes were filed as a Court Exhibit but were not provided to the jury.
*See* ECF No. 15-11 at 144–45.

The trial court denied Williams's application to exclude the Vanderlinde
sentencing minutes because of the alleged *Brady* violation, concluding that there
was no evidence that the 2002 sentencing minutes, from proceedings well in
advance of the 2003 trial, were not disclosed to Williams's counsel at the 2003 trial.
ECF No. 15-11 at 149–50.  The trial court also noted that Judge Gleeson, in
granting Williams's habeas petition, did not find (although he could have) that his

16

trial counsel was ineffective.  ECF No. 15-11 at 148.  The trial court also found that the full transcript of Vanderlinde's testimony at the 2003 trial is "far more probative than prejudicial."  ECF No. 15-11 at 150:8–9.  The trial court then reaffirmed its original ruling to admit the transcript with the parties' agreed-upon redactions.  ECF No. 15-11 at 150.

Vanderlinde's testimony from the 2003 trial was then read into the record. He claimed that, when he was a cellmate of Williams's at MDC, Williams had told him about "a girl [who] died in Babylon."  ECF No. 15-11 at 172:14–15.  Williams allegedly told Vanderlinde that "he was chasing the girl, three girls in the car, and he shot the tire, and that the car flew up in the air and flipped over and hit a train underpass."  ECF No. 15-11 at 172:22–73:2.  According to Vanderlinde, Williams told him that "one girl was dead and the other two were injured," and that "if he only knew there was two alive, [he] would have come back and killed both of them." ECF No. 15-11 at 173:9–12.  Vanderlinde testified that Williams said the reason he shot at the car was a drug debt of "a few hundred dollars," but said he did this because "it was like a principal, like the drug business.  If you let it go a little thing, the big one, you got to put an example."  ECF No. 15-11 at 176:7–15.

The jury heard Williams's 2003 trial counsel cross examine Vanderlinde on his criminal history, and particularly his history of cooperation with law enforcement, including cooperation that led him to be sentenced to probation on drug charges that carried a mandatory minimum sentence of fifteen years to life incarceration.  ECF No. 15-11 at 188–89.  On cross, Vanderlinde acknowledged

17

several times that he hoped he would have his sentenced reduced in his federal case based on his testimony at Williams's trial, and that he had discussed this possibility with his lawyer.  ECF No. 15-11 at 193:23–194:18, 195:19–196:12, 214, 220. Defense counsel also inquired as to whether Vanderlinde had any expectation of relief from his impending deportation as a result of his cooperation.  ECF No. 15-11 at 218–220.  Defense counsel asked, "So you have every expectation that you're going to be deported upon the completion of your sentence?" to which Vanderlinde responded, "Yeah."  ECF No. 15-11 at 219:13–16.

The prosecution next called Morales, who testified to his involvement with Weiner and role in the events leading up to the car crash, as well as his phone conversations with Williams during the crash.  *See supra*.  While Morales was on the phone with Williams and Madigan as they chased the girls' car, he heard Madigan "say once or twice for him, you know, to stop—stop, slow down, things of that nature."  ECF No. 15-11 at 269:8–10.  He next heard Williams say, "oh shit. They crashed."  ECF No. 15-11 at 269:19–20, 321: 14–16.  Shortly after the crash, Morales met Williams and Madigan in Williams's driveway, and Williams told him he fired the gun "to try to scare them into pulling over."  ECF No. 15-11 at 271:25. When the three reconvened at Morales's house later that night, they talked "about what happened," and Williams and Madigan told him about the girl who was ejected from the car.  ECF No. 15-11 at 273:10–12.  During this conversation, Williams told Morales: "it was crazy, it was like something out of a movie."  ECF No. 15-11 at 273:18–19.  After Williams had returned from upstate and learned that

Weiner had survived, Morales spoke with Williams, who told Morales that "she was in the coma, which is a good thing, because she's the only one that can ID him.  He made comments about going there and maybe, you know, pulling the plug or hoping that she didn't pull out of it."  ECF No. 15-11 at 278:12–17.

The prosecution next called ballistics expert George Krivosta, a forensic scientist with the firearms unit at the Suffolk County crime laboratory.  ECF No. 15-11 at 374–75.  He opined that the ballistics evidence obtained from Singh's Nissan was consistent with a shot fired from the driver's side of a vehicle traveling in the right lane, with the front of the shooting vehicle level with the rear of the target vehicle.  ECF No. 15-11 at 419.  On cross, defense counsel asked if the bullet's trajectory could be consistent with a gun fired from the passenger side of the shooting vehicle if the cars were in a slightly different positions; it appears from the state court record that Krivosta strained to demonstrate how far the passenger, in his opinion, would have been required to lean out the window in order to fire the shot in question.  ECF No. 15-12 at 22–23.  ("For that to take place, I would literally have to be outside the car like this (indicating).  I'm sorry, I can't do it.").  He acknowledged that if the shooting car was much further behind the target car, the bullet in question could have been fired from the passenger side.  ECF No. 15-12 at 26–27.  However, he opined that as the distances between the vehicles become greater, the likelihood of accurately shooting the targeted car lessens, especially if the car is traveling at 60 to 80 mph.  ECF No. 15-12 at 27.  Thus, while he could not eliminate this possibility, in his view, it was less probable in this circumstance than

19

a conclusion that the bullet was fired from the driver's side.  ECF No. 15-12 at 27, *see* ECF No. 15-12 at 58–59.

Finally, the prosecution called Dr. Michael Caplan, the chief medical examiner of the Suffolk County Medical Examiner's office, ECF No. 15-12 at 67, who testified that he reviewed Candice Arena's external examination and toxicology reports, which indicated the presence of alcohol and THC in her system.  ECF No. 15-12 at 75.

The defense called no witnesses, and Williams did not testify.  ECF No. 15-13 at 5.  However, through cross-examination and argument, the defense urged the jury to find that the evidence indicated that Madigan fired the gun—and sought to frame Williams.  ECF No. 15-10 at 59; ECF 15-13 at 62–63, 72–73, *see* ECF No. 15-11 at 112–15.  For example, defense counsel sought to establish that Madigan was more involved in Williams's efforts to collect his debt from Weiner than she appeared on direct, eliciting that Madigan was in the car with Williams when he went to Weiner's house.  ECF No. 15-11 at 44–48.  Defense counsel also sought to undermine Madigan's credibility, highlighting that her relationship with Williams became much closer after the incident, ECF No. 15-11 at 40, 130, and drawing out inconsistencies in her testimony about events on the night of the incident.  *See* ECF No. 15-11 at 64–69, 86–88, 91–94.

The defense also attempted to establish that Williams did not have the requisite mental state of depraved indifference to human life.  ECF No. 15-10 at 63–64; ECF No. 15-13 at 77–80.  And Defense counsel sought to impeach the credibility

of Madigan and Morales specifically—two witnesses who were central to the prosecution's efforts to prove that Williams acted with depraved indifference and expressed no remorse following the incident, even after learning Arena had died. Defense counsel cross examined Madigan extensively on purported inconsistencies between her testimony at trial and previous statements made to the police, ECF No. 15-11 at 56–62, and prior testimony in this case.  ECF No. 15-11 at 46–48, 77–79, 112–115.  Defense counsel cross examined Morales on his own criminal history, ECF No. 15-11 at 343–365, and incentive to testify at the 2015 trial in order to receive a reduced sentence on pending charges.  ECF No. 15-11 at 364–66 ("Q. Based upon your testifying here today, it is your belief that you will receive a sentence of time served, right? A. Hopefully.").

In summations, the defense highlighted inconsistencies in witness testimony, sought to establish that Madigan was the shooter, and argued that, if she was, the prosecution could not succeed in proving that Williams acted with depraved indifference to human life.  ECF 15-13 at 62–63, 72–73, 77–80.  The prosecution, by contrast, argued that it had proved through credible lay and expert testimony that Williams was the shooter and otherwise acted with depraved indifference to human life in the events that led to Arena's death and Singh's and Weiner's injuries.  *See* ECF No. 15-13 at 90–110.  The prosecution further highlighted the absence of evidence supporting the defense's theory that Madigan was the shooter.  *See* ECF No. 15-13 at 84.

The jury deliberated for two days and sent back ten notes.  Five of these notes asked the trial court to repeat its instructions on certain crimes and elements, including but not limited to depraved indifference.  *See* ECF No. 15-14 at 51; ECF No. 15-15 at 2–3, 8.  On February 27, 2015, the jury returned a verdict finding Williams guilty of the top count of murder in the second degree, and the four related counts.  ECF No. 15-15 at 19.  Williams filed a motion to set aside the verdict, ECF No. 14-5, which was denied at sentencing.  ECF No. 15-16 at 13.

On April 3, 2015, Williams was sentenced to twenty-five years to life imprisonment for count one, second degree murder, fifteen years determinate plus five years of post-release supervision for counts two and three, fifteen years plus five years post-release supervision for count four, and five years determinate plus five years post-release supervision for count five, with all sentences to run concurrently except count five, to run consecutively.  ECF No. 15-16 at 37–38.  Accordingly, Williams's aggregate sentence was thirty years to life.

### c.  State Post-Conviction Proceedings

Williams appealed his conviction, arguing that (1) the introduction of the Vanderlinde testimony violated his rights under the Confrontation Clause; (2) the prosecution failed to show a mens rea of depraved indifference; (3) the trial court erred in denying a motion to dismiss the indictment on the ground that the grand jury was insufficiently instructed on depraved indifference; (4) the trial court erred in imposing a consecutive sentence with respect to the weapons possession conviction; (5) the trial court incorrectly charged the jury with regard to the

difference between depraved indifference and intentional murder; (6) trial counsel was ineffective; and (7) he was denied a fair trial based on the prosecutor's references to statements he made after the crime.  ECF No. 14-6.

By decision dated June 6, 2018, the Appellate Division affirmed Williams's conviction.  *People v. Williams*, 162 A.D.3d 694, 694 (2d Dep't 2018).  The Appellate Division held that the evidence was legally sufficient to prove depraved indifference beyond a reasonable doubt—that Williams had recklessly engaged in conduct which created grave risk of death to another person.  *Id.* at 696.  By presenting evidence that showed that Williams "engaged in a high-speed chase, in the course of which he fired a gun at the fleeing car, causing Singh, the driver, to lose control of that car" and "exhibited no signs of remorse for the results of his recklessness, and even went so far to express his disappointment that Weiner had survived the crash," the prosecution had provided sufficient evidence to support the verdict.  *Id.* at 696–97.  The Appellate Division rejected Williams's Confrontation Clause argument, holding that, since Vanderlinde "was deported before the second trial commenced, and was barred from re-entering the United States," the Court properly admitted his previous testimony given that the prosecution's failure to produce him "was not due to indifference or a strategic preference."  *Id.* at 697 (quoting *People v. Arroyo*, 54 N.Y.2d 567, 571 (1982)).  The Appellate Division rejected Williams's remaining arguments.  *Id.* at 698.

Williams sought leave to appeal to the New York Court of Appeals, which was denied on August 27, 2018.  ECF No. 13 at 1.  Williams filed a petition for a

writ of certiorari with the Supreme Court of the United States on November 19, 2018, ECF No. 13-12, which was denied on January 7, 2019. *Williams v. New York*, 139 S. Ct. 847 (2019).[2]

On December 12, 2019, Williams, proceeding *pro se*, filed a request to unseal two pages of grand jury testimony, after noticing that three pages of the *Rosario* packet from his 2015 trial were missing. ECF No. 13-7 at 1. The District Attorney's office provided the missing pages without a court order, although it argued that the office was not legally required to do so. ECF No. 13-14 at 3. On January 9, 2020, the trial court granted the motion to the extent that the prosecution had already provided the information Petitioner sought. ECF No. 13-15.

On March 26, 2021, Williams, represented by counsel, moved to vacate the judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10 (the "440 motion"). *See* ECF No. 15-20 at 1–2. He argued (1) the prosecution withheld *Brady* and *Rosario* material from him; (2) the prosecution knowingly presented false and misleading testimony at trial; (3) trial counsel was ineffective for failing to properly

---

[2] Williams filed a *pro se* motion for a writ of error coram nobis in August 2019. ECF No. 14-13 at 4–5. He argued that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to object to the prosecutor's use of misleading testimony. ECF No. 14-13 at 6. The Appellate Division denied his motion on March 4, 2020, ECF No. 14-1, and the Court of Appeals denied leave to appeal on June 11, 2020. ECF No. 14-2. Williams filed a second petition for a writ of error coram nobis in July 2020, arguing that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to request a missing witness charge for a Detective Donald Tavares. ECF No. 14-12 at 6–7. The Appellate Division denied his motion on November 4, 2020, *People v. Williams*, 188 A.D.3d 727 (2d Dept. 2020), and the Court of Appeals denied leave to appeal on January 28, 2021. *People v. Williams*, 36 N.Y.3d 1054 (2021).

address the use of the 2003 Vanderlinde testimony, failing to impeach Madigan on the basis of her immunity, failing to discover and use evidence of Williams's remorse, failing to object to evidence of uncharged crimes, and failing to comprehend petitioner's prior sentence; and (4) the cumulative effect of all errors. ECF No. 15-20 at 41–70.

On November 22, 2021, Judge Ambro denied Williams's 440 motion. *See* ECF No. 14-14 at 469. Judge Ambro held that both procedural misconduct claims were procedurally barred, concluded that the ineffective assistance arguments were meritless, and rejected the cumulative error argument. ECF No. 14-14 at 469–74. Williams sought leave to appeal from the New York Court of Appeals on December 23, 2021, ECF No. 14-14 at 1, which was denied on April 6, 2022. ECF No. 14-15.

### d. The Instant Petition

The instant Petition was timely filed on May 31, 2022. *See* ECF No. 1. Williams also filed a memorandum of law and attached exhibits in support of his Petition. *See* ECF No. 1-1; ECF No. 2. Respondent filed its opposition on November 28, 2022, *see* ECF No. 11, after several extensions. Petitioner filed a reply on December 27, 2022. *See* ECF No. 16.

### DISCUSSION

### I. Federal Review of State Convictions

A federal court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii)

informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of New York*, 380 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Federal review of state convictions is further constrained by the procedural default doctrine.  Federal courts generally "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotation marks and citation omitted).  A state court's "reliance on state law must be clear from the face of the opinion" to satisfy the "independent" requirement.  *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotation marks omitted).  To satisfy the "adequate" requirement, a state court decision must be based on a state rule that is "firmly established and regularly followed" by courts of that state.  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)).  Federal courts in this Circuit have repeatedly held that New York law's gatekeeping provisions governing a petitioner's failure to raise a claim on direct appeal represent "the application of a 'firmly established and regularly followed' New York rule." *Williams v. Goord*, 277 F. Supp. 2d 309, 318–19 (S.D.N.Y. 2003) (citations omitted); *see Driver v. Coveny*, 19-cv-03860 (DC), 2023 WL 4066558, at *5 (E.D.N.Y. June 15, 2023) (same).

Even where a federal court is authorized to reach the merits of a claim, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrows the

scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits.  28 U.S.C. § 2254(d).  A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97–98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).

Thus, when a federal court adjudicates a habeas claim on the merits, the state court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  Similarly, "[a]n unreasonable application of" federal law occurs if the state court's decision "identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *id.* at 413, or if it "fails to extend a principle of clearly established law 'to situations which that principle should have, in reason, governed.'" *Tueros v. Greiner*, 343 F.3d 587, 591 (2d Cir. 2003) (quoting *Kennaugh v. Miller*, 289 F.3d 36, 45 (2d Cir. 2002)). However, for a petitioner to succeed there must be "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 102 .

## II. Analysis

In this Petition, Williams seeks habeas relief on the following grounds: (1) his rights under the Confrontation Clause were violated, (2) the prosecution knowingly presented false and misleading testimony at trial by introducing the Vanderlinde testimony from the 2003 trial; (3) the prosecution withheld *Brady* material from him by omitting a page of Madigan's grand jury testimony from the *Rosario* packet at the 2015 trial; (4) he received ineffective assistance from trial counsel; and (5) the cumulative effect of all errors denied him a fair trial. *See* ECF No. 1 at 5–10, 15.

Subject to the exception described below, *see infra* at 65–66 n.10, Williams has exhausted his state remedies as to all five of his claims. *See* 28 U.S.C. § 2254(b)(1)(A). He raised his Confrontation Clause claim in his direct appeal to the appellate division, his application for leave to appeal to the Court of Appeals, and his petition for a writ of certiorari from the U.S. Supreme Court. The Appellate division denied the claim on the merits, *People v. Williams*, 162 A.D.3d 694, 697 (2d

28

Dep't 2018), the Court of Appeals denied leave to appeal, ECF No. 13 at 1, and the

U.S. Supreme Court denied certiorari. *Williams v. New York*, 139 S. Ct. 847 (2019).

Williams raised his four other claims in his 440 motion dated March 26, 2021. ECF

No. 15-20 at 41–70. The Supreme Court, Suffolk County denied his motion, ECF

No. 14-14 at 474, and he sought leave to appeal to the Appellate Division, which

was denied. ECF No. 14-15. Accordingly, where relevant, the Court reviews the

"last reasoned decision" of the state court, *Ylst v. Nunnemaker*, 501 U.S. 797, 804

(1991), and "look[s] through" unreasoned summary decisions to evaluate the trial

court's decision denying Williams's 440 motion. *Wilson v. Sellers*, 138 S. Ct. 1188,

1190 (2018); *see Richardson v. Capra*, 18-cv-7694 (VEC), 2023 WL 2601895, at *6

n.9 (S.D.N.Y. Mar. 22, 2023).

### A. Confrontation Clause

Williams first argues that the state trial court violated his rights under the

Confrontation Clause by permitting Vanderlinde's testimony from the 2003 trial to

be read into the record at his 2015 trial. ECF No. 1 at 5; ECF No. 2 at 31–40. The

state court's decision deeming Vanderlinde "unavailable" to testify was contrary to

clearly established precedent of the United States Supreme Court, Williams argues.

Williams points to *Barber v. Page*, 390 U.S. 719 (1968), and argues that *Barber*

requires a higher showing of due diligence than prosecutors demonstrated here.

ECF No. 2 at 32–33. However, for the reasons explained below, while *Barber* is

certainly instructive here, this Court cannot say that the state court's denial of

relief on this ground was "contrary to, or involved an unreasonable application of"

29

Supreme Court precedent, 28 U.S.C. § 2254(d)(1), as AEDPA requires for a court to grant habeas relief.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "Supreme Court caselaw clearly establishes that the Confrontation Clause entitles a criminal defendant to 'a meaningful opportunity to cross-examine witnesses against him.'" *McCray v. Capra*, 45 F.4th 634, 646 (2d Cir. 2022) (quoting *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014)), *cert. denied*, 143 S. Ct. 624 (2023); *see also Davis v. Alaska*, 415 U.S. 308, 315 (1974). "Testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine the witness." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). "As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." *Ohio v. Roberts*, 448 U.S. 56, 74–75 (1980), *overruled on other grounds by Crawford*, 541 U.S. at 68–69.

A witness is not "unavailable" for the purposes of this exception to the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber*, 390 U.S. at 724–25; *see Hardy v. Cross*, 565 U.S. 65, 70 (2011) (per curiam) (explaining that a state has a "duty of good-faith effort" to secure a witness's presence). The Supreme Court has explained that "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness," *Hardy*, 565 U.S. at 70 (quoting *Roberts*, 448 U.S. at

30

74), and has cautioned that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how uncompromising." *Id.* at 71–72. Indeed, the deferential standard of review set out in AEDPA, "does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Id.* at 72.

Here, the trial court heard evidence that Vanderlinde had, in fact, been deported and was currently residing in the Dominican Republic, which the Suffolk County Police Department's investigator confirmed through an electronic-records search of the phone number provided by Vanderlinde's son, which "came back to" the Dominican Republic. ECF No. 15-4 at 9. However, there was no evidence that anyone from the police department or prosecution called that number to ascertain Vanderlinde's whereabouts or willingness to testify, and the investigator who ran the search confirmed that he had not done so. ECF No. 15-4 at 9–10, 15. Nor is there any indication in the record that any form of remote testimony was ever considered or investigated as a possibility.

The trial court also found that, because Vanderlinde was deported on account of having been convicted of an aggravated felony, he was inadmissible from the United States for life. ECF No. 15-4 at 35 (noting that Vanderlinde "is not allowed back in the country"); *see* 8 U.S.C. § 1182(a)(9)(A)(i) (explaining that a noncitizen previously ordered removed is inadmissible "*at any time* in the case of [a noncitizen] convicted of an aggravated felony" (emphasis added)). The prosecution had argued

31

that it was not required for them to apply for an S visa or for significant public benefit parole.  ECF No. 15-4 at 16–17, 20.  But the trial court held that it was clear that he could not qualify for an S visa.  ECF No. 15-4 at 35–36; *see* 8 U.S.C. § 1101(a)(15)(S) (authorizing visas for witnesses if they have information about a "criminal organization or enterprise," or a "terrorist organization, enterprise, or operation").  The trial judge did not explicitly address significant public benefit parole.  Accordingly, the trial judge determined that the prosecution "have established due diligence that they won't be able to bring Jose Vanderlinde before the Court to testify," deeming Vanderlinde unavailable.  ECF No. 15-4 at 36–37.

The Appellate Division affirmed, relying on the fact that Vanderlinde "was deported before the second trial commenced, and was barred from re-entering the United States."  *People v. Williams*, 162 A.D.3d 694, 697 (2018).  Accordingly, the Appellate Division held that the trial court "properly admitted Vanderlinde's testimony from [Williams's] first trial, as the prosecutor's failure to produce [Vanderlinde] 'was not due to indifference or a strategic preference for presenting [the witness's] testimony in the more sheltered form of [trial] minutes rather than in the confrontational setting of a personal appearance on the stand.'"  *Id.* (third and fourth alterations in original) (quoting *Arroyo*, 54 N.Y.2d at 571).

Williams argues that the prosecution failed to satisfy the standards of good faith and due diligence with its efforts to secure Vanderlinde's availability for the

2015 trial.[3]  For one, Williams argues Vanderlinde could be brought back to the United States through a mechanism known as Significant Public Benefit Parole. ECF No. 2 at 36.  Under this pathway, even an inadmissible noncitizen may be "parole[d] into" the United States for a limited time and for a limited purpose, such as testifying in a criminal case.  8 C.F.R. § 212.5(a); 8 U.S.C. § 1182(d)(5)(A) (explaining that parole "shall not be regarded as an admission of the [noncitizen]").  However, the determination of whether to actually grant parole at prosecutors' request lies entirely in the discretion of ICE.  *See* 8 C.F.R. § 212.5(a).  And ICE may demand "reasonable assurances that the [noncitizen] will . . . depart the United States when required to do so," including "a bond" or "reasonable conditions" of supervision.  *Id.* § 212.5(d).  Williams also argued that the prosecution could have attempted to secure Vanderlinde's testimony by remote means.  ECF No. 2 at 37.

---

[3] Williams also appears to argue that the state court applied the wrong legal standard in applying *Arroyo*, 54 N.Y.2d at 567, and determining that the prosecutor's failure to produce Vanderlinde was "not due to indifference or strategic preference." *People v. Williams*, 162 A.D.3d at 697.  Williams argues that this is an improperly subjective standard, whereas the standard of due diligence as articulated by the Supreme Court is objective.  ECF No. 2 at 33–35.  However, the Second Circuit has explained that the *Arroyo* standard and the "due diligence" requirement are simply two analogous, alternative ways of phrasing the prosecution's burden.  *See Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) ("The New York Court of Appeals has observed that the purpose of the due diligence requirement of that statute is to ensure that failure to produce the witness 'was not due to indifference or a strategic preference for presenting [the witness'] testimony in the more sheltered form of . . . minutes rather than in the confrontational setting of a personal appearance on the stand.'" (quoting *Arroyo*, 54 N.Y.2d at 571)); *see also Phan v. Greiner*, 165 F. Supp. 2d 385, 400 (E.D.N.Y. 2001) (same).  And, indeed, the Supreme Court's standard inquires into the prosecutor's "good faith." *Barber*, 390 U.S. at 724–25.  This argument fails.

However, the question before this Court is not to independently evaluate whether prosecutors exercised the good faith and due diligence required by law before asserting that Vandervelde was "unavailable" and asking the trial court to so find. It is, instead, to consider whether the Appellate Division's holding was contrary to—or an unreasonable application of—clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). And no Supreme Court case law requires that the prosecution attempt to secure visas or significant public benefit parole to bring deported witnesses into the United States, especially where they are subject to lifetime inadmissibility. Moreover, no Supreme Court case law requires that the prosecution make efforts to secure remote testimony from a deported witness in order to satisfy their burden to make "reasonable," "good-faith efforts" to secure that witness's availability.

Williams argues that the state court's decision was an unreasonable application of the Supreme Court's decision in *Barber*. *See* 390 U.S. at 720. In *Barber*, the witness at issue was "incarcerated in a federal penitentiary in . . . Texas, about 225 miles from the trial court in Oklahoma." *Id*. The prosecution based its determination of unavailability solely on the ground that the witness was outside the jurisdiction. *Id*. The Supreme Court held that the "mere absence of a witness from the jurisdiction" was not enough, and that witness was not unavailable because the prosecution instead "made absolutely no effort to obtain [his] presence . . . at trial" apart from determining that he was serving a sentence in a federal prison. *Id*. at 723, 725; *see Hardy*, 565 U.S. at 69–70 (discussing *Barber*).

34

The Supreme Court explained that the prosecution could have obtained a writ of habeas corpus *ad testificandum* from a federal court or state court, noting that it was the United States Bureau of Prisons' policy to permit prisoners to testify subject to such writs. *Barber*, 390 U.S. at 724. However, where the prosecution made "no effort to avail themselves of either of the above alternative means," the Supreme Court held that they did not satisfy their burden to "ma[ke] a good-faith effort to obtain his presence at trial." *Id.* at 724–25.

The Court agrees that applying *Barber* might result in a colorable claim for relief, were the Court deciding the issue under a less stringent standard of review. To prevail in federal habeas, however, Williams must show that his case involves "a set of materially indistinguishable facts" from those in *Barber, see Williams*, 529 U.S. at 413, or that his case is a "situation [in] which [*Barber*'s] principle should have, in reason, governed." *Tueros*, 343 F.3d at 591 (2d Cir. 2003). Several important distinctions preclude either such finding in this case.

The first and greatest distinction between *Barber* and the facts at issue here is that Vanderlinde—a Dominican citizen residing in the Dominican Republic—was outside the subpoena power of even the federal courts, nor could his presence as a witness be secured through extradition. *See United States v. Mejia*, 376 F. Supp. 2d 460, 465–66 (S.D.N.Y. 2005) (citing Fed. R. Crim. P. 17(e)(1); 28 U.S.C. § 1783(a)); *United States v. Taveras*, No. 04-CR-156 (JBW), 2006 WL 1875339, at *15 (E.D.N.Y. July 5, 2006). The Court in *Barber* criticized the prosecution for not taking at least one of two alternative steps that would have been virtually guaranteed to secure the

35

witness's appearance, since it was standard practice for federal prisons to produce incarcerated witnesses for state court appearances across district lines pursuant to federal or state writs of habeas corpus *ad testificandum*. *Barber*, 390 U.S. at 724. But here, Vanderlinde was beyond the reach of such a writ or subpoena, much less a routine practice of witness production across district lines once a writ or subpoena had been issued.

Indeed, many more steps would have been required to secure Vanderlinde's testimony. First, since Vanderlinde could not be compelled to testify, the prosecution would have initially needed to determine whether he was even willing to testify (and travel to the United States to do so). Second, prosecutors would have then needed to apply for significant public benefit parole on his behalf. Even if prosecutors had made such an application, however, the decision whether to grant parole is a discretionary one that rests entirely with ICE. Third, as part of this application, Suffolk County would likely have had to propose to ICE a monitoring package to ensure Vanderlinde did not abscond while he was in the United States— especially given his criminal history—for there to be any likelihood of a parole application being approved. *See* 8 C.F.R. § 212.5(d) (noting that ICE "may require reasonable assurances that the [noncitizen] will . . . depart the United States when required to do so," including "a bond" or "reasonable conditions" of supervision). An acceptable monitoring package would likely require close supervision by county law

36

enforcement or probation departments.[4]  Fourth, even if prosecutors were able to prepare (and get authorization for) a supervision package, and even if ICE were to approve the application, prosecutors would have still had to then facilitate Vanderlinde's travel to the United States, which, being beyond the reach of the subpoena power, he could decline to go forward with at any time—an outcome that would certainly be possible if he did not want to be subject to stringent supervision while in this country.

Ultimately, *Barber* does not constitute a "set of materially indistinguishable facts" to Williams's case.  *Williams*, 529 U.S. at 412–13.  Nor is this a "situation which [*Barber*'s] principle should have, in reason, governed," *Tueros*, 343 F.3d at 591, such that there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 562 U.S. at 102.  No Supreme Court precedent requires that prosecutors take the extensive steps that might have enabled Vanderlinde to return to the United States to testify (but would by no means have guaranteed his presence) in order to satisfy the requirement that they make reasonable, good-faith efforts to have him appear.  For this Court to hold that *Barber* is "materially indistinguishable" from the facts

---

[4] The prosecution represented at the pre-trial hearing that it would be unable to monitor Vanderlinde while he was in the United States.  ECF No. 15-4 at 18.  Williams argues that it would be possible for either the state or federal government to do so.  ECF No. 16 at 9 ("There were various ways for them to [monitor Vanderlinde] through their probation department, the federal parole that Vanderlinde was subject to, material witness orders . . . .").  Regardless, this is indeed an extra step that the prosecution would have had to take for it even be a possibility for Vanderlinde to get the requisite authorization to come back to this country.

and circumstances of this case, involving a deported witness beyond the subpoena power of state and federal courts and for whom there was only a limited, discretionary pathway to reenter the country to testify, would be to go beyond what AEDPA allows.  Indeed, more recent Supreme Court precedent emphasizes that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising," and that AEDPA "does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Hardy v. Cross*, 565 U.S. 65, 71–72 (2011) (per curiam).  The Court cannot conclude that no fair-minded jurist would disagree that the state court's decision here conflicts with Supreme Court precedents.

Moreover, the Court has not identified (nor has Williams offered) any clearly established law as stated by the U.S. Supreme Court requiring prosecutors to consider and pursue the option of remote testimony to satisfy the requirement that they make reasonable efforts to secure a witness's availability to testify.  Thus, although law enforcement agents in Suffolk County could certainly have called Vanderlinde's phone number to ascertain his interest in and availability to appear by remote testimony, no clearly established law required them to do so, and accordingly, the state court's decision is not contrary to clearly established law.

The Court here pauses to underscore that, were it to be evaluating Williams's arguments under a different standard of review, the result might well be different. It is particularly concerning that, even when presented with Vanderlinde's cell

phone number, the police investigator failed to call that number or make any efforts at all to contact Vanderlinde.  As such, state officials failed to take even the first step and ascertain if Vanderlinde would be willing to travel to New York to testify. Further, while it is true that ICE could have denied significant public benefit parole—or that senior officials in the District Attorney's office may have vetoed any proposed supervision plan—the Supreme Court emphasized in *Barber* that, in exercising the required due diligence under the Confrontation Clause, "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Barber*, 390 U.S. at 724.

The Court is similarly troubled by the prosecution team's failure to take any steps to explore the possibility of securing remote testimony from Vanderlinde. While there may have been reasons it was not feasible or permissible in this case, no such inquiries were ever made.  No one asked Vanderlinde if he would be able and willing to testify remotely, and no one asked the trial court whether it would permit remote testimony.  The Court recognizes that the pre-trial hearing on Vanderlinde's availability (and the trial itself) took place before the COVID-19 pandemic made remote proceedings, as well as remote testimony at otherwise-live proceedings, more common.  That calculus would likely be far different today, subject to the additional considerations courts apply when considering whether to permit what has traditionally been described as "two-way video" testimony at trial. *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999); *United States v. Akhavan*, 523 F. Supp. 3d 443, 455 (S.D.N.Y. 2021) (evaluating "whether [the witness] is

unavailable and whether exceptional circumstances warrant[ed] the use of two-way video testimony"); *cf. United States v. Griffin*, 11-cr-936 (RJS), 2021 WL 3188264, at *1 (S.D.N.Y. 2021).

Indeed, it is difficult to conceive of any scenario today in which a prosecutor could satisfy the due diligence and "good faith" standard without taking steps to explore whether a witness who testified at a prior trial, but is now outside the Court's subpoena power, is willing and able to testify remotely, and to advise the trial court and opposing counsel of the constraints on that option (or lack thereof). This is especially so in cases like this one, where prosecutors actually have the witness's current contact information and know that he is in weekly contact with relatives in the United States. In the current era, prosecutors who fail to make such basic inquiries under similar circumstances before representing that a witness is "unavailable" under *Barber* and its progeny will do so at their peril.

Despite the foregoing, given the extraordinary deference this Court is required to afford the state court's evaluation of the issue under AEDPA, as well as the distinctions from the facts of *Barber* outlined above, Williams's Confrontation Clause claim does not succeed on the merits. It is therefore denied.[5]

### B. Introduction of False Testimony

Williams next raises an additional challenge to the admission of the 2003 Vanderlinde testimony at the 2015 trial, arguing that the prosecution knowingly

---

[5] The Court therefore does not address Respondents' arguments that, even if Williams's right to confrontation was violated, any constitutional error was harmless. ECF No. 11 at 52; *see Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (explaining harmless error standard).

introduced false testimony. Specifically, Williams argues that Vanderlinde's characterization of the benefits he received (or hoped to receive) for testifying at the 2003 trial were false.  According to Williams, Vanderlinde testified falsely in three respects: (1) by "testify[ing] that he got nothing for his cooperation against Williams, yet he was able to hand-pick the prison he served his federal sentence in"; (2) testifying "that he had no expectation whatsoever that he could receive help with deportation, yet the prosecutor admitted on the record that he did"; and (3) testifying that "his federal sentencing judge specifically told him that he would not and could not get any credit for his cooperation against Williams, yet the judge said no such thing."  ECF No. 2 at 46–47.  Williams argues that the introduction of this testimony violated his right to due process under *Napue v. Illinois*, 360 U.S. 264 (1959).  ECF No. 2 at 40–41; *Napue*, 360 U.S. at 269 ("[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . [even if] the false testimony goes only to the credibility of the witness.").

Williams raised this claim in state court in his 440 motion.  The state court held that Williams's claims regarding the introduction of false testimony were barred because they should have been made on direct appeal.  ECF No. 14-14 at 471.  Judge Ambro held that the claim was barred by N.Y. Crim Proc. Law § 440.10(2)(c) because "the facts underlying this claim, *i.e.,* Vanderlinde's Federal Sentencing Minutes, are record based."  ECF No. 14-14 at 471; *see* N.Y. Crim Proc. Law § 440.10(2)(c) ("Although sufficient facts appear on the record . . . upon appeal from such judgment . . . no such appellate review or determination occurred owing

41

to the defendant's unjustifiable failure to take or perfect an appeal . . . ."). Alternatively, he rejected the claim under § 440.10(3)(a), holding that "to the extent the record is found to be lacking on this issue for the purpose of appeal, the Court, in its discretion, denies this aspect of defendant's motion as any such failure would be based upon a lack of due diligence."  ECF No. 14-14 at 471.  He did not reach the merits in the alternative.  *See id.*

Respondent argues that this claim is procedurally defaulted, because the state court rejected it under two adequate and independent state procedural bars, N.Y. Crim Proc. Law §§ 440.10(2)(c) and 440.10(3)(a).  Williams argues that this Court should reach the merits, since (1) the procedural bars were "exorbitantly applied," ECF No. 2 at 42, *see Lee v. Kemna*, 534 U.S. 362, 376 (2002); *Pierotti v. Walsh*, 834 F.3d 171, 177 (2d Cir. 2016), and (2) alternatively, he can assert "cause for the default and actual prejudice as a result of the alleged violation."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

However, the Court need not reach Williams's arguments that he can overcome default because, even assuming *arguendo* that the claim is not defaulted, it is clear that he is not entitled to relief on the merits.  That is so even upon *de novo* review.  *See Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (where a state court does not reach the merits of a claim, the federal habeas court reviews the claim *de novo*).

Where a habeas corpus petition alleges prosecutorial misconduct, the appropriate standard of review is "the narrow one of due process, and not the broad

exercise of supervisory power." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990).

It is well settled that prosecutors "may not knowingly use false evidence, including

false testimony, to obtain a tainted conviction . . . [even if] the false testimony goes

only to the credibility of the witness." *Napue*, 360 U.S. at 269; *Drake v. Portuondo*,

553 F.3d 230, 240 (2d Cir. 2009) ("Supreme Court holdings have long 'established

that a conviction obtained through use of false evidence, *known* to be such by

representatives of the State, must fall under the Fourteenth Amendment.'"

(emphasis in original) (quoting *Napue*, 360 U.S. at 269)).  For Williams's

prosecutorial misconduct claim to succeed, Williams must show that (1) there was

false testimony; (2) the "Government knew or should have known that the

testimony was false," *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir.

1993) (quoting *United States v. Agur*s, 427 U.S. 97, 103 (1976)); and (3) there was a

"reasonable likelihood" that the false testimony could "have affected the judgment of

the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972).

In the first place, Williams has not demonstrated that the Vanderlinde

testimony was, in fact, false.  Williams argues that the first purportedly false

statement was Vanderlinde's testimony "that he got nothing for his cooperation

against Williams, yet he was able to hand-pick the prison he served his federal

sentence in."  ECF No. 2 at 46.  However, Vanderlinde never testified that he "got

nothing" in exchange for his cooperation and was only asked if he got "credit off" his

federal sentence for his cooperation; and he truthfully testified that he did not.  ECF

No. 15-11 at 178:13–20; ECF No. 15-11 at 179:2–18.

Second, Williams argues that Vanderlinde testified that "he had no expectation whatsoever that he could receive help with deportation" and that this testimony was false. ECF No. 2 at 47. However, this is not an entirely accurate characterization of Vanderlinde's testimony. When asked on cross, "So you have every expectation that you're going to be deported upon the completion of your sentence?" Vanderlinde's answer was "Yeah." ECF No. 15-11 at 219. And when asked, "You had no discussions about how your continued cooperation can help you avoid deportation and get a modification of your sentence in federal court?" his answer was, "About deportation, I know nothing about that." ECF No. 15-11 at 220.

Williams points to nothing in the record demonstrating this testimony was false. Prosecutors may have speculated (as Williams contends) that Vanderlinde "was hoping that maybe he would get some consideration on his deportation issue."[6] And at one point during the 2015 trial, Assistant District Attorney Janet Albertson stated to the trial court that Vanderlinde "may have expected some benefits from deportation," *i.e.*, some assistance in preventing his deportation, when he testified. ECF No. 15-11 at 147. However, as Albertson explained, "he obviously didn't get [those benefits], since the Court held a hearing and he was deported." ECF No. 15-11 at 147 (stated in argument outside the presence of the jury). The prosecutor's speculation about what Vanderlinde *may* have expected is not enough to establish that his testimony disclaiming any such expectation was false. That is particularly

_____

[6] Williams asserts that a prosecutor made this statement at a pretrial hearing on January 21, 2015, ECF No. 2 at 18–19, 41, but neither party provided a transcript for this date. However, even assuming that a prosecutor made this statement, it is immaterial, as explained *infra*.

44

so where, as here, there is no evidence that the witness received any such assistance from the prosecution, nor that he received any consideration or benefit from immigration officials as a result of his testimony.

Third, Williams argues Vanderlinde testified falsely when he stated "the judge sentenced me, tell me I didn't get no credit for" his cooperation against Williams. ECF No. 15-11 at 179:2–18. The sentencing minutes reveal that Judge Koeltl, presiding over Vanderlinde's sentencing in the Southern District of New York, did not explicitly say to Vanderlinde that he was *not* getting credit off his sentence for his cooperation against Williams (which had only begun a week before his federal sentencing). *See* ECF No. 15-19 at 63–95. However, his counsel had not requested a downward departure based on his cooperation with Suffolk County, but only based on different cooperation efforts with federal prosecutors. ECF No. 15-19 at 79–81. And, in fact, he did not receive any reduction in his sentence for cooperation. *See* ECF No. 15-19 at 87.

Even if Vanderlinde's testimony to Williams's jury regarding what did (or did not) transpire at his federal sentencing qualified as a false statement, it cannot support a prosecutorial misconduct claim. In the first place, even if this statement were arguably false, there is no indication in the record that the prosecution was aware of its falsity prior to introducing the Vanderlinde testimony. Accordingly, since at most the prosecution "should have known" this misleading character of this statement, the question is whether "the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."

45

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (citation and alteration omitted), *abrogated on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023).  Even if prosecutors knew the testimony was false, Williams must still show that there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Helmsley*, 985 F.2d at 1205–06; *Wallach*, 935 F.2d at 456.

Here, Vanderlinde's statement, ECF No. 15-11 at 179:2–18 ("[T]he judge sentenced me, tell me I didn't get no credit for that."), fails under either materiality standard.  Vanderlinde's credibility was effectively impeached through extensive cross examination at the 2003 trial on the issue of personal benefits he sought as a result of his testimony.  Indeed, Vanderlinde conceded several times that he hoped to go back to his federal sentencing court to get credit off his sentence following his testimony at Williams's trial; this gave the jury substantial grounds to conclude that he was a self-interested witness with other motives to give testimony favorable to the prosecution.  ECF No. 15-11 at 194:9–18 ("Question: You wanted to cooperate, you wanted to get credit for information you were going to turn over; yes? . . . You were looking to get credit? Answer: In the beginning."); ECF No. 15-11 at 214:14–24 ("I let my lawyer know I sent the letter [to Suffolk County police] . . . I thought I was going to get credit."); ECF No. 15-11 at 220:12–14 ("Question: But you know you could get your sentence modified; is that correct? Answer: That's correct."); ECF No. 15-11 at 195:20–196:2 ("[D]id [your lawyer] tell you that you could ultimately be brought back in front of the federal judge that sentenced you and he could modify

your sentence if you continue to cooperate? . . . Answer: Yes, that's correct.").  These admissions painted a clear picture of Vanderlinde's potential motives for testifying against Williams.

The discrepancy that Williams now cites—*i.e.,* whether the sentencing judge (as opposed to someone else, such as his counsel) told Vanderlinde he wouldn't actually get credit off his sentence as a result of his testimony—is immaterial.  This is especially so given the uncontroverted fact that, as of the time of his testifying at Williams's trial, Vanderlinde *had not* gotten any credit off his sentence.  And the same holds true for Williams's claim that the jury would have found Vanderlinde substantially less credible had they known that he did, in fact, hope to receive some assistance from the state in preventing his deportation, particularly since he apparently received none.  Williams has not shown a "reasonable likelihood" that this allegedly false testimony would "have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

Accordingly, even if this Court were to reach the merits of this false testimony claim, it would be unsuccessful, and is therefore denied.

### C. Missing Page of Madigan's Grand Jury Testimony

Williams next argues that he was denied a fair trial because the prosecution withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  ECF No. 1 at 8; ECF No. 2 at 48.  The purportedly exculpatory evidence Williams identifies is one page of Madigan's testimony to the grand jury, which was missing from his *Rosario* packet.  ECF No. 2 at 48.  On this page of testimony, Madigan was asked, "Did [Williams] ever show any remorse about the fact that

47

another girl other than Melissa Weiner died?" and she responded, "Not at the time, but later on, I guess, he felt bad about it."  ECF No. 13-14 at 5.  Williams argues that this testimony indicates his remorse—an issue that the jurors were asked to consider at trial, and which the appellate division considered in assessing his sufficiency of the evidence arguments on direct appeal, *Williams*, 162 A.D.3d at 697 ("Following the crash, the defendant exhibited no signs of remorse for the results of his recklessness . . . ."), and is exculpatory.

This claim was raised in Williams's 440 motion, but the state court concluded that it was procedurally barred because it should have been raised on direct appeal. ECF No. 14-14 at 469–71 (citing N.Y. Crim Proc. Law §§ 440.10(2)(c), 440.10(3)(a)). Alternatively, the state court rejected the claim on the merits, holding that Williams failed to "demonstrate prejudice," since "any belated expression of remorse by defendant paled in relevance to his more temporally proximate statements following the crash (for example, defendant's statements that it was 'just like a movie' and that it was 'raining sparkly bitches,' in reference to the decedent's ejection from the car, and that Melissa Weiner got what she deserved because she owed defendant a drug debt)."  ECF No. 14-14 at 470–71.

Williams argues that the procedural bars were exorbitantly applied, and, alternatively, that he can establish cause and prejudice for the default.  ECF No. 2 at 49–50.  Even assuming *arguendo* that he can succeed on either argument, on the merits, Williams is not entitled to relief on this ground.

Where a petitioner alleges prosecutorial misconduct, "[t]he appropriate standard of review . . . is whether the prosecutor engaged in 'egregious misconduct . . . amount[ing] to a denial of constitutional due process.'" *Blissett v. Lefevre*, 924 F.2d 434, 440 (2d Cir. 1991) (quoting *Floyd*, 907 F.2d at 353). "Prosecutorial misconduct denies a defendant due process only when it is 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)). "To establish a *Brady* violation, a defendant must show (1) that the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice must have ensued.'" *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999)). Under this third requirement, the evidence must be "material"—that is, there must be "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (alteration in original) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))

Because the state court reached the merits in the alternative, AEDPA's deferential standard of review applies to this Court's review of the merits of this claim. *Tavarez v. Larkin*, 814 F.3d 644, 650 (2d Cir. 2016). Accordingly, the

49

petition may be granted on this ground only if the state court's decision was "objectively unreasonable." *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (quoting *Williams*, 529 U.S. at 409).

      Williams's claim does not meet this high standard.  The state court concluded that there was no reasonable probability that the outcome of the trial would have been different if the jury had heard Madigan's statement.  ECF No. 14-14 at 470–71.  This conclusion was not objectively unreasonable.  The jury heard extensive testimony from both Madigan and other witnesses who described Williams's lack of remorse and anger upon learning that Weiner had not been killed.  ECF No. 15-11 at 32–33 (Madigan Test.); ECF No. 15-11 at 278 (Morales Test.); *cf.* ECF No. 15-11 at 173 (Vanderlinde Test.).  They heard Morales testify that Williams described the crash as "crazy, it was like something out of a movie."  ECF No. 15-11 at 273:18–19; *see id.* at 274:9–11 (describing Williams's demeanor at that time as "changing" between "hyper. . . worried, sometimes nonchalant").  The jurors heard Madigan testify that the day after the incident, Williams was "bragging about getting away with murder, that it was raining sparkly bitches, can't have people walking around owing him money."  ECF No. 15-11 at 29:17–19.  They further heard Madigan explain that Williams had said he wanted "to kill [Madigan] and bury [her] in the woods," because she "was a witness and saw everything."  ECF No. 15-11 at 29:20–30:3.

      After he learned that Weiner had survived, the jurors heard Madigan testify that Williams was "pissed off that she lived and that she could identify him," and

that Williams "wanted [Weiner] killed so she couldn't testify against him," encouraging Madigan to go to the hospital in Williams's mother's scrubs and inject Weiner with bleach. ECF No. 15-11 at 32:6–33:8. Similarly, Morales testified that Williams told him Weiner "was in the coma, which is a good thing, because she's the only one that can ID him. He made comments about going there and maybe, you know, pulling the plug or hoping that she didn't pull out of it." ECF No. 15-11 at 278:12–17. Indeed, Weiner testified that "he said that I should have—I should count myself lucky that the accident happened and that he would have killed me anyway." ECF No. 15-7 at 352:23–25. The jurors also heard—to the extent they credited it—the Vanderlinde testimony that, even a year after the incident, Williams had said that "if he only knew there were two [girls] alive, [he] would have come back and killed both of them." ECF No. 15-11 at 173:10–12.

In fact, Madigan's testimony *supports*, rather than undercuts, a finding that Williams lacked remorse: when asked if he had shown remorse about Arena's death, she said "not at the time." ECF No. 13-14 at 5. Compared to this evidence, it was not objectively unreasonable for the state court to conclude that Madigan's statement that "*not at the time, but later on, I guess, he felt bad about it,*" ECF No. 13-14 at 5 (emphasis added), would not have affected the outcome of the trial. Indeed, the entirety of the Madigan statement at issue—including the portion in which she reports that Williams felt *no* remorse in the days that followed Singh's death and the other passengers' serious injuries—might only have aided the prosecution's case in that regard.

51

Accordingly, Williams's petition is denied as to this ground as well.

### D. Ineffective Assistance of Counsel Claims

Williams further asserts that he was deprived of the effective assistance of counsel at the 2015 trial.  He asserts five bases for ineffective assistance: (1) trial counsel's failure to object to the introduction of the 2003 Vanderlinde testimony on the ground that it was false and misleading, ECF No. 2 at 53; (2) trial counsel's failure to use the federal sentencing minutes to impeach Vanderlinde, ECF No. 2 at 56–57; (3) trial counsel's failure to elicit that Madigan "received immunity as a result of her testimony before the grand jury," ECF No. 2 at 59; (4) trial counsel's failure to "discover and utilize evidence of [Williams's] remorse," ECF No. 2 at 61; (5) trial counsel's "misapprehension of Williams's prior sentence," ECF No. 2 at 64; and (6) the cumulative effect of all counsel's errors in the aggregate.  ECF No. 1 at 10; ECF No. 2 at 69–70.

### a.  Legal Standard

To succeed on an ineffective assistance of counsel claim, a petitioner must show (1) that "in light of all the circumstances," the acts or omissions of trial counsel "were outside the wide range of professionally competent assistance," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 690, 694 (1984); *see United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020).  Under *Strickland* there is a strong "presumption of effective performance," *Greiner v. Wells*, 417 F.3d 305, 326 (2d Cir. 2005); in other words, a reviewing court must "presum[e] that, under the circumstances, the challenged

action might be considered sound trial strategy." *Nolan*, 956 F.3d at 83 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689). Courts will "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'" *Greiner*, 417 F.3d at 319 (quoting *Sacco v. Cooksey*, 214 F.3d 270, 275 (2d Cir. 2000)).

For a federal court sitting in habeas, "[w]hen the claim at issue is one for ineffective assistance of counsel, moreover, AEDPA review is 'doubly deferential.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). This is because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690). Given the deferential standard of review to state court decisions on habeas, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Id.* at 13; *Woods*, 578 U.S. at 117; *see also Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254 are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks and citations omitted)).

### b. Analysis

#### i. Failure to Object to Vanderlinde Testimony on Falsity Grounds

Williams claims that he received ineffective assistance of trial counsel because his counsel failed to object to the introduction of the Vanderlinde testimony

on prosecutorial misconduct grounds; that is, that the prosecution was knowingly seeking to introduce false testimony.  *See Napue*, 360 U.S. at 269.

The state court denied this ineffective assistance claim and the following one in adjudicating Williams's 440 petition, concluding in relevant part that "Vanderlinde was not an indispensable witness in [the prosecution's] case," and counsel's failure to make this argument did not deprive petitioner of effective assistance of counsel, noting that "failure to make an argument, objection or motion that has little chance of success does not constitute . . . ineffective assistance."  ECF No. 14-14 at 472 (quoting *People v. Leonard*, 177 A.D.3d 1158, 1163 (3d Dep't 2019)).

The state court's decision on this ineffectiveness claim was not unreasonable. Williams was not prejudiced by his counsel's failure to object to introduction of the Vanderlinde testimony on *Napue* grounds, because the challenged portion of the Vanderlinde testimony was not false, and there is no likelihood that these portions of his testimony impacted the jury's verdict in any event.  *See supra* at 46–47.  And even if Vanderlinde's statement that the sentencing judge told him he would not get credit off his federal sentence for his cooperation in Williams's case was misleading, it was not materially so—there was no reasonable likelihood that it would have affected the judgment of the jury given the already extensive cross-examination into Vanderlinde's motivations for testifying.  In this way, even if trial counsel committed error, there is no "reasonable probability that, but for" such error, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

The state court's decision was not "unreasonable." *Williams*, 529 U.S. at 413.

Accordingly, Williams's ineffective assistance claim is denied on this basis.

### ii. Failure to Impeach Vanderlinde Testimony with Sentencing Minutes

Williams next claims he received ineffective assistance because his trial counsel failed to attempt to impeach the Vanderlinde testimony with the federal sentencing minutes. The state court held that trial counsel was under no obligation to make this argument that had little chance of success, noting that "the benefit of the of the impeachment evidence, that Vanderlinde could select the prison where he would serve his federal sentence and might have received help in avoiding deportation, was nominal in light of the Federal Court's refusal to downwardly depart from the sentencing guidelines and the resultant 188 month, or approximately 15 1/2 years, sentence, as well as defendant's ultimate deportation." ECF No. 14-14 at 472.

Failing to impeach a key witness "may in some circumstances rise to the level of ineffective assistance." *Rodriguez v. Portuondo*, No. 01 CIV. 0547 (PAC), 2006 WL 2168314, at *10 (S.D.N.Y. Aug. 1, 2006) (collecting cases). However, as noted *supra,* his 2003 trial counsel already succeeded in substantially impeaching Vanderlinde and obtaining numerous admissions regarding the significant personal benefits he hoped to obtain through his cooperation in Williams's case.

The state court was not unreasonable in concluding that, in context, the additional potential impeachment value of Vanderlinde's prison housing recommendation was minimal—and thus that Williams was not prejudiced by

55

counsel's omission.[7]  Vanderlinde was extensively cross examined on his lengthy criminal history, ECF No. 15-11 at 181–93, past history of cooperation with law enforcement, including a that he served 5.5 months (and was sentenced to lifetime probation) on charges that carried a 15-to-life mandatory minimum in 1994.  ECF No. 15-11 at 187–92.  Moreover, counsel elicited that Vanderlinde had initially reached out to Suffolk County Law enforcement about Williams in the hopes he could get a sentence reduction in his federal case, ECF No. 15-11 at 194:9–18 ("Question: You wanted to cooperate, you wanted to get credit for information you were going to turn over; yes? . . . You were looking to get credit? Answer: In the beginning."); ECF No. 15-11 at 214:14–24 ("I let my lawyer know I sent the letter [to Suffolk County police] . . . I thought I was going to get credit."), that, at the time of his testimony, he still hoped to get reduction on his federal sentence in exchange for his testimony against Williams, ECF No. 15-11 at 220:12–14 ("Question: But you know you could get your sentence modified; is that correct? Answer: That's correct."), and that he had discussed with his counsel returning to the sentencing judge to seek modification following his testimony.  ECF No. 15-11 at 195:20–196:2 ("[D]id [your lawyer] tell you that you could ultimately be brought back in front of the federal judge that sentenced you and he could modify your sentence if you continue to cooperate? . . . Answer: Yes, that's correct.").  Any reasonable juror would already have significant doubts as to Vanderlinde's credibility after hearing

---

[7] The state court also referred to minimal value of impeachment evidence that Vanderlinde "might have received help in avoiding deportation."  ECF No. 14-14 at 472.  No such evidence is contained in the sentencing minutes, however.

this testimony, and learning that he received a housing benefit for testifying would not change that result. *See Strickland*, 466 U.S. at 694.   Accordingly, Williams was not prejudiced by his counsel's omission, and his ineffective assistance claim on this ground is also unsuccessful.

### iii.  Failure to Elicit That Madigan Received Immunity

Williams next contends that his counsel was ineffective for failing to elicit that Madigan "received immunity" as a result of her testimony before the grand jury in his case.  ECF No. 1 at 10; ECF No. 2 at 59–61.

The state court concluded that it did not constitute ineffective assistance for counsel to fail to elicit that Madigan received immunity, since "Ms. Madigan was not granted immunity in exchange for her cooperation, but rather received the immunity automatically conferred upon every non-targeted witness who testifies before the grand jury."  ECF No. 14-14 at 473.  Therefore, the court reasoned, "[c]ross-examining Ms. Madigan on that basis may very well have served only to reinforce with the jury that she, after a police investigation, was not considered to be the shooter (*i.e.*, a target), in this case."  ECF No. 14-14 at 473.

The state court was correct—and at least not unreasonable—in assessing the risks of cross-examining Madigan on this basis and concluding that it was a reasonable strategic judgment for counsel to decline to pursue this line of questioning.  *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2004) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective

assistance claim." (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987))).  Williams's primary defense at trial was that Madigan was the shooter, and he had only been driving the car.  *See, e.g.*, ECF 15-13 at 62–63, 72–73, 77–80. Accordingly, it was not unreasonable for trial counsel to conclude that there would be serious inherent risks in pursuing this line of questioning.  Cross-examining Madigan on this basis could open the door to evidence that police never considered Madigan to be the shooter, including potential testimony from law enforcement on that score.  Given the "double deference" that this Court must give to ineffective assistance claims under AEDPA—*i.e.*, deference both to counsel's reasonable strategic judgment, and to the state court's assessment of counsel's performance— this claim also cannot succeed.

### iv.  Failure to Discover and Utilize Evidence of Williams's Remorse

Williams next argues that trial counsel was ineffective for failing to elicit evidence of his remorse, including by failing to identify the missing page of the *Rosario* packet containing Madigan's statement referencing Williams's remorse or lack thereof, in which she said, "Not at the time, but later on, I guess, he felt bad about it," ECF No. 13-14 at 5, and failing to cross examine Madigan with a statement she made at the 2003 trial that Williams "squashed the money with [Weiner] because he felt bad about what happened to her."  ECF No. 15-22 at 10:14– 15; *see* ECF No. 2 at 61.

Again, Williams was not prejudiced by counsel's failure to cross examine Madigan on this basis, and the state court was not unreasonable in holding as such.

If anything, to cross examine Madigan on these statements may have cut against Williams's defenses.  The context of both statements is unhelpful for Williams. Madigan testified that Williams did not express remorse "at the time"—which cuts in favor of the jury finding that the acted with the requisite "depraved indifference to human life."  *See* N.Y.P.L. § 125.25(2).  And in 2003, although Madigan did testify that Williams "squashed the money with [Weiner] because he felt bad what happened to her," immediately following that statement she testified that "[Williams] told me that basically he thought he got away with murder."  ECF No. 15-22 at 10:14–25.

Moreover, the probative value of Williams "squash[ing] the money" with Weiner is minimal given testimony (which the jury was entitled to credit) that he may have sought to have her killed in the hospital by injecting her with bleach, ECF No. 15-11 at 32–33, told Morales he was thinking about going to the hospital and pulling the plug while she was in a coma, ECF No. 15-11 at 278, and even Weiner's testimony that Williams told her she should count herself "lucky that the accident happened," and that Williams "would have killed [her] anyway."  ECF No. 15-7 at 352:23–25.  This is in addition to the other evidence the jury heard going to Williams's state of mind.  *See supra* at 50–51.  The state court's decision that this tactic "would have had little chance of success," ECF No. 14-14 at 473, was not unreasonable.  Williams's ineffectiveness claim on this ground also fails.

### v. Misapprehension of Williams's Prior Sentence

Williams next makes a somewhat labyrinthine argument that his trial counsel was ineffective for "misapprehending" his prior sentence.[8]  He argues that trial counsel was ineffective for (1) conducting all plea negotiations under the mistaken impression that his 2003 sentence was 30 years to life imprisonment, and (2) failing to object on vindictiveness grounds when he was sentenced to 30 years to life at the 2015 trial.  ECF No. 2 at 64–69.

The basis of this argument is Williams's theory that, although following his 2003 trial, the trial court sentenced him to an aggregate term of 30 years to life (25 years to life on Second Degree murder, with all sentences for the lesser counts to run concurrently save the five year sentence for criminal use of a firearm in the first degree), ECF No. 11 at 3; ECF No. 15-25 at 6, his commitment paperwork indicates an aggregate sentence of 25 years to life, with all sentences to run concurrently. ECF No. 15-24 at 85; *see also* ECF No. 15-25 at 1–2 (Suffolk County Correctional Facility intake paperwork).  Williams extrapolates from this discrepancy that the 2003 sentencing judge must have recognized that he imposed sentence in an illegal manner and corrected this illegality on the commitment paperwork.  ECF No. 2 at 64–65.  Williams points to no other evidence in the record that the sentencing court

---

[8] Respondent did not respond to this asserted basis for Williams's ineffective assistance of counsel claim.  However, since Williams bears the burden of demonstrating that he is in custody in violation of the laws or Constitution of the United States, *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997); *Greiner*, 417 F.3d at 319 ("The habeas petitioner bears the burden of establishing both deficient performance and prejudice."), the Court may not grant relief on this claim merely because it is unopposed.

reconsidered its sentence in 2003 or revised it out of concerns that it was illegal. However, he argues that trial counsel was ineffective for failing to argue that the 2015 sentence was vindictive when the trial judge imposed it.  ECF No. 2 at 68. There is a rebuttable presumption that a sentence is vindictive if an individual, after they were convicted, then retried and convicted again, has a higher sentence imposed.  *People v. Van Pelt*, 76 N.Y.2d 156, 161 (1990) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969) *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).

The state court rejected these arguments when presented in Williams's 440 motion.  The state court concluded that Williams's "2015 sentence was not vindictive as the intent of the sentencing Judge in 2003 was to impose a sentence of 30 years to life, albeit, as defendant submits, in an illegal manner.  Defendant's 2015 sentence mirrored that prior court's intent only now, lawfully."  ECF No. 14-14 at 473.  Therefore, the state court reasoned that "there is no apparent reasonable likelihood that the enhanced sentence was the result of vindictiveness and consequently, counsel was not ineffective for failing to pursue a strategy for a reduction of defendant's sentence that had little chance of success."  ECF No. 14-14 at 473.  The state court also highlighted that "there is no indication that the People's bottom line offer in this case was in anyway circumscribed by defendant's perceived 2003 sentence."  ECF No. 14-14 at 473.

The state court's conclusion was not unreasonable, and Williams's ineffectiveness argument cannot succeed—particularly where this Court is required

61

to be "doubly deferential" to the actions of trial counsel.  *Woods*, 578 U.S. at 117.  It was not unreasonable for the state court to conclude that a vindictiveness objection would have "had little chance of success."  ECF No. 14-14 at 473.  Although New York Courts have held that courts "possess an inherent power to correct clerical errors" in a defendant's commitment sheet, *People v. Muriel-Herrera*, 68 A.D.3d 1135, 1136 (2d Dep't 2009), *see* ECF No. 15-21 at 25 (Williams's 440 reply brief), what Williams suggests is different: that the 2003 sentencing court determined its own sentence was illegal and *sub silentio* corrected it only on commitment paperwork, without any notice to the parties.  Even if this is a practice that the state court employed, under the required standard of review, Williams's claim for habeas relief cannot succeed.  It is not unreasonable to conclude that Williams was not prejudiced by his counsel's failure to make this argument at his 2015 sentencing: to do so would have required him to assert that Judge Ambro's sentence was vindictive when it was the same sentence as that imposed on the record by the sentencing judge in 2003.  Accordingly, the state court was not unreasonable in concluding that Williams was not prejudiced by his counsel's failure to raise this argument, given its extremely low probability of success.

Similarly, it was not unreasonable for the state court to conclude that there is "no indication that the People's bottom line offer" was impacted by the purported discrepancy in Williams's 2003 sentence.  ECF No. 14-14 at 473.  Williams has provided no evidence to suggest that plea negotiations were impacted by the fact that there was a difference in the 2003 judge's sentencing ruling and the

commitment paperwork, nor any evidence that, if presented with this discrepancy, the prosecution would forego the on-the-record sentence imposed by the sentencing judge in favor of the commitment paperwork when determining a plea offer.  It is also not a reasonable inference from the record that this discrepancy impacted plea negotiations in any way.  Under the doubly deferential standard this Court must impose, Williams cannot succeed on this claim of ineffective assistance.

### vi.  Cumulative Effect of Trial Counsel's Errors

Williams further argues that even if each of these purported errors does not rise to the level of ineffective assistance in isolation, when taken together, they show that he was denied the effective assistance of counsel at his 2015 trial.  ECF No. 2 at 69–72.

Trial counsel's errors may be considered "in the aggregate" for the purpose of an ineffective assistance claim.  *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  But a petitioner "must still demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."  *Miller v. Senkowski*, 268 F. Supp. 2d 296, 314 (E.D.N.Y. 2003).

Although its ruling is not especially clear, the state court did take into consideration these errors in the aggregate, concluding that all claims of ineffectiveness were available to the Appellate Division on the record, which concluded that Williams was not deprived of the effective assistance of counsel.  The state court hearing Williams's 440 motion also considered counsel's overall

performance, finding that "counsel attempted to preclude Vanderlinde's testimony, delivered clear and cogent opening and closing arguments, conducted meaningful cross-examination of the People's witnesses, highlighted inconsistencies in their testimonies, raised objections consistent with the theory of the defense, and was zealous and forceful in the defense of his client." ECF No. 14-14 at 474. Accordingly, the same deferential standard of review imposed by AEDPA continues to apply to this claim.

Again, the state court was not unreasonable to conclude that, even when viewed in the aggregate, counsel's acts and omissions did not deprive Williams of the effective assistance of counsel. Even when considered in the aggregate, Williams has not demonstrated prejudice from the aforementioned acts and omissions of trial counsel. Even if trial counsel had advanced the arguments or probed the lines of questioning Williams identifies here, very little would have changed at trial. It is not likely that the Vanderlinde testimony would have been excluded on falsity grounds. *See supra* at 54. Any additional impeachment value against Vanderlinde gleaned from the federal sentencing minutes would have been marginal at best, given the extensive impeachment already achieved by trial counsel. *See supra* at 55–57. The impeachment value of Madigan's immunity would also have been marginal given that it would have opened the door to evidence regarding why she was not considered a target of the investigation, *i.e.,* that law enforcement never considered her to be the shooter. *See supra* at 57–58. And the purported evidence of remorse, if presented in context, is at best neutral and, at

worst, would cut in favor of the prosecution's efforts to establish depraved indifference. *See supra* at 58–59.[9]  Given the marginal value these additional lines of questioning or arguments would have had, and considering them in context, it cannot be said that, but for these omissions, the prosecution's case "would have collapsed," *Lindstadt*, 239 F.3d at 205, or that the "result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## E. Cumulative Error Claim

Finally, Williams argues that the cumulative effect of all the purported errors he identifies in his petition—the improper introduction of the Vanderlinde testimony in violation of the Confrontation Clause, the prosecutors' alleged knowing introduction of the false Vanderlinde testimony and failure to disclose certain portions of Madigan's prior statements, and all of trial counsel's alleged errors—combined to deprive Williams of a fair trial.  ECF No. 2 at 72–73.[10]

---

[9] The fifth purported error Williams identifies was counsel's "misapprehension" of his prior sentence, but these errors would have impacted the sentencing and plea negotiation process rather than trial.  A criminal defendant's right to counsel extends to plea negotiations, *Lafler v. Cooper*, 566 U.S. 156, 162 (2012), and sentencing. *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *see Glover v. United States*, 531 U.S. 198, 200 (2001).  However, given that Williams was very likely not prejudiced by this purported error either, this does not help his argument either.

[10] Respondent argues that this cumulative error claim is unexhausted. Williams raised a cumulative error claim in his 440 motion, but it did not include this particular combination of errors, Respondent argues.  ECF No. 11 at 75–76. Specifically, Williams did not raise the Confrontation Clause argument in his 440 motion, since it was raised on direct appeal.  Thus, when Williams argued that the cumulative effect of all errors identified in his 440 motion was to deny him a fair trial, he did not include the Confrontation Clause argument, and thus the state court did not have the opportunity to evaluate this particular combination of errors

In his 440 motion, Williams argued that the "various errors argued in this motion and on direct appeal . . . combined to deprive" him of a fair trial.  ECF No. 15-20 at 69.  The state court rejected the cumulative error argument, explaining that "The relief sought in defendant's Points I through III is denied.  Consequently, that same relief based on the cumulative effect of each of these asserted errors is similarly denied."  ECF No. 14-14 at 474.

The state court's language indicates it may have misunderstood the cumulative error doctrine.  This doctrine provides a path for relief in circumstances where, *even if* none of the individual errors justify relief from a petitioner's conviction standing alone, taken together they amount to a violation of the petitioner's right to due process.  *See United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008) (collecting cases).  A court could find that there was a series of errors at trial, each harmless on its own, but when viewed cumulatively warrant granting relief. *See, e.g., United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967) (holding that, although not "any one of the errors committed during the trial would have required reversal of the convictions . . . the total effect of the errors we have found was to cast such a serious doubt on the fairness of the trial that the convictions must be reversed").

---

Williams now alleges deprived him of a fair trial, Respondent argues.  ECF No. 11 at 76.  Williams responds that he incorporated the Confrontation Clause argument into his cumulative error argument in his 440 motion, noting that he argued that "various errors that were raised in both the 440 motion *and on direct appeal* denied Williams his constitutional rights to due process and a fair trial." ECF No. 16 at 32 (emphasis added); *see* ECF No. 15-20 at 69.  Even assuming this claim is properly exhausted, for the reasons stated *infra*, it fails on the merits and must be denied.

However, this is not such a case.  Even if the state court's analysis of Williams's cumulative-error claim misapplied the law, Williams does not succeed on this ground even upon *de novo* review.  The Second Circuit has recognized that relief under the cumulative error doctrine is available when "the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." *Al-Moayad*, 545 F.3d at 178.  However, this Court has not concluded that there were *any* errors at trial—at least none that can overcome AEDPA deference.  *See United States v. Yousef*, 327 F.3d 56, 127 (2d Cir. 2003) (holding that a particular defendant "was not denied his due process right to a fair trial by the cumulative effect of the District Court's errors during the trial because the District Court committed no errors with respect to [him].").  Were the Court to have concluded that Williams's trial was tainted by more than one constitutional error, but each was harmless, perhaps a cumulative error argument might prevail, if the combined effect of those errors undermined confidence in the outcome of the trial.  But Williams has made no such showing here, and accordingly the petition is denied as to this claim.

## III.   Conclusion

Williams has not shown any basis for relief under the demanding standards required by 28 U.S.C. § 2254.  Accordingly, the petition is denied.  Additionally, a certificate of appealability will not issue, because Williams has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal taken from

this decision and order would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated:    September 27, 2023
          Brooklyn, New York